## CLARK DISTILLING COMPANY v. WESTERN MARYLAND RAILWAY COMPANY AND STATE OF WEST VIRGINIA.

## CLARK DISTILLING COMPANY v. AMERICAN EXPRESS COMPANY AND STATE OF WEST VIRGINIA.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF MARYLAND.

Nos. 75, 76. Argued May 10, 11, 1915; restored to docket for reargument November 1, 1915; reargued November 8, 9, 1916.—Decided January 8, 1917.

The West Virginia prohibition law of February, 1913, Code 1913, c. 32A, as amended by Acts of 1915, p. 33, *id.* p. 660, includes in its prohibitions the bringing into the State by carriers of intoxicating liquors intended for personal use and the receipt and possession of such liquors, when so introduced, for personal use.

Since the right asserted by the plaintiff is a permanent right to ship such liquors into the State, the decision concerns the state law as now amended, though the amendment occurred after the decision of the court below and after the first argument in this court.

Without considering whether governmental power respecting intoxicating liquors extends to the prohibition of personal use, the right to restrict the means of procuring them for that purpose exists as an incident to the indubitable power to forbid manufacture and sale. Therefore these prohibitions of the West Virginia law are not offensive to the due process clause of the Fourteenth Amendment.

The prohibitions, however, unless sanctioned by a valid law of Congress, would be repugnant to the Constitution as a direct burden

on interstate commerce and an interference with the power of Congress to regulate it. *Leisy* v. *Hardin*, 135 U. S. 100.

The Act of Congress of March 1, 1913, 37 Stat. 699, known as the Webb-Kenyon Act, operated, if constitutional, to give effect to the above stated prohibitions of the West Virginia law in respect of liquors shipped into the State for personal use, by withdrawing from such shipments the immunity of interstate commerce, and, to forbid the shipment or transportation into the State of liquors intended to be received or possessed there for personal use contrary to such state prohibitions. *Adams Express Co.* v. *Kentucky*, 238 U. S. 190, distinguished.

The Webb-Kenyon Act is a legitimate exertion of the power to regulate commerce.

That power, in the case of intoxicants, because of their character extends to the total prohibition of their transport in interstate commerce, and necessarily includes the lesser power, exercised in the Webb-Kenyon Act, of adapting the regulation to the various local requirements and conditions that may be expressed in the laws of the States.

Such a mode of exercise involves no delegation of the power to the States.

Neither is the act objectionable as productive of a lack of uniformity. This results:

(1) Because it applies uniformly to the conditions which call it into play; its provisions apply to all the States, and

(2) Because the power of Congress to regulate interstate commerce is not subject to the restriction that regulations shall be uniform throughout the United States.

The right of Congress to regulate a subject of interstate commerce, its scope and the mode in which it may be exerted, depend upon the degree of the power of Congress over the subject regulated, viz., in this case, intoxicating liquor, and not upon those considerations which cause some subjects of interstate commerce to be under state control in the absence of congressional regulation and others to be free from state control until Congress has acted. *Leisy* v. *Hardin*, *supra*, explained and applied.

The Webb-Kenyon Act is not repugnant to the due process clause of the Fifth Amendment.

219 Fed. Rep. 333; *id.* 339, affirmed.

THESE were suits for injunctions compelling the defendants to accept intoxicating liquors for shipment into West Virginia. The appeals were taken from decrees

·of the District Court dismissing the bills.   The facts are stated in the opinion.

*Mr. Lawrence Maxwell*, with whom *Mr. Joseph S. Graydon, Mr. Walter C. Capper* and *Mr. J. Phillip Roman* were on the briefs, for appellant:

The Webb-Kenyon Law does not in any way change the status, or permit any State to change the status, of liquors shipped in interstate commerce, except such as are intended "to be received, possessed, sold, or in any manner used," in violation of the law of the destination State. *Adams Express Co.* v. *Kentucky*, 238 U. S. 190.   The. Kentucky statute involved in that case was in all respects similar to the West Virginia statute, prior to the amendment by the West Virginia legislature on May 24, 1915. Both prohibited the interstate transportation and in terms made the place of delivery the place of sale, both in respect to intrastate and interstate shipments, and regardless of whether the shipments were intended for personal or other use.   But this court, approving the construction of the Webb-Kenyon Law which had been adopted by the Court of Appeals of Kentucky in *Adams Express Co.* v. *Commonwealth*, 154 Kentucky, 462, held that, as the law of Kentucky permitted the personal use of liquors by the citizen and possession thereof for such use, the Webb-Kenyon Law conferred on the State of Kentucky no power to prohibit the transportation for such use, or to make the place of delivery the place of sale. The law of West Virginia also recognizes the right of the citizen of that State to have and use liquor.   See *State* v. *Gilman*, 33 W. Va. 146, under the old constitution; and the same principle announced under the constitution of 1912 and in cases arising under the present law,— *State* v. *Sixo*, 87 S. E. Rep. 267; *Emsweller* v. *Wallace*, 88 S. E. Rep. 787; *State* v. *Baltimore & Ohio R. R. Co.*, 89 S. E. Rep. 288.

That being true, the decision in the Kentucky case is determinative of this case, unless it be that the amendment of May 24, 1915, to the West Virginia Law necessitates a different conclusion. That amendment makes it unlawful for a citizen of the State to receive intoxicating liquors from a common carrier, or to have in his possession liquors received from a carrier, even when intended for personal use. But where the state law permits the citizen to purchase liquors, carry them to his home, keep them there for personal use and use them, a law which punishes the receipt of liquors for personal use from a common carrier is not a police measure authorized by the Webb-Kenyon Law, but is, in so far as it applies to interstate shipments, a law regulating commerce in violation of the commerce clause of the Constitution.

Congress did not intend by the Webb-Kenyon Law to permit the States to regulate such interstate commerce, *Adams Express Co.* v. *Kentucky, supra;* nor could Congress constitutionally confer or re-delegate such power to the States, being the power to regulate interstate commerce in its fundamental aspect. *Rhodes* v. *Iowa,* 170 U. S. 412; *Minnesota Rate Cases,* 230 U. S. 352.

The power which the States exerted under the Wilson Law was in respect to incidents of commerce only, and did not constitute a direct burden on commerce in its fundamental aspect. See cases above cited and *cf. Delamater* v. *South Dakota,* 205 U. S. 93, and *Rosenberger* v. *Pacific Express Co.,* 240 U. S. 48.

Incidentally, it is contended that plaintiff is not entitled to the relief prayed in the bill, because plaintiff's proposed shipments into West Virginia would result from orders solicited in West Virginia, contrary to § 8 of the law, which forbids advertising and the solicitation of orders, and *State* v. *Davis,* 87 S. E. Rep. 262, is relied on, in connection with *Delamater* v. *South Dakota, supra.* But *State* v. *Davis,* holding that the solicitation of orders by interstate mail

was illegal, was based on the erroneous assumption that the resulting sales would be consummated at the place of delivery in West Virginia, in accordance with § 3 of the statute. As the State had no power to make the place of delivery the place of sale, it has no power to make the solicitation of orders by interstate mail for lawful sales in Maryland, illegal. *Delamater* v. *South Dakota, supra,* is not in point. That case involved a South Dakota statute imposing a tax upon the business of personally soliciting orders in the State of South Dakota. Such statute was held not a direct burden on interstate commerce, and valid under the Wilson Law. The solicitation here involved constitutes a transaction carried on in two States and one "which in its very nature requires to be governed by laws apart from the laws of the several States." The precise point was decided in *Rose* v. *State,* 133 Georgia, 353.

*Mr. W. B. Wheeler* and *Mr. Fred O. Blue* for the State of West Virginia.

By leave of court, a brief was filed by the Attorneys General of the States of Alabama, Arizona, Georgia, Idaho, Iowa, Kansas, Mississippi, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, Tennessee, Virginia and Washington, as *amici curiæ.*

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

To refer to the principal state law relating to these suits, to the pleadings and the decision of the court below, will make the issues in these cases clear and point directly to the elements required to be considered in deciding them.

West Virginia in February, 1913, enacted a prohibition

law to go into effect on July 1st of the following year. Code 1913, c. 32A. Putting out of view the right of druggists under stringent regulations provided by the statute to sell for medicinal purposes and the right otherwise to sell wine for sacramental and alcohol for scientific and manufacturing purposes, the law forbade "the manufacture, sale, keeping or storing for sale in this state, or offering or exposing for sale" intoxicating liquors, and the intoxicants embraced were comprehensively defined. The statute contained many restrictions concerning hotels, restaurants, clubs and so-called associations where liquor was kept and served either as a result of membership or by gift or otherwise, which were evidently intended to prevent the frustration of the prohibitions against the keeping of intoxicants for sale and purchase by subterfuge in the guise of the exercise of an individual right. There was no express prohibition against the individual right to use intoxicants and none implied unless that result arose (a) from the prohibition in universal terms of all sales and purchases of liquor within the State, (b) from the clause providing that every delivery made in the State by a common or other carrier of the prohibited intoxicants should be considered as a consummation of a sale made in the State at the point of delivery, and (c) from the prohibitions which the statute contained against solicitations made to induce purchases of liquor and against the publication in the State of all circulars, advertisements, price-lists, etc., which might tend to stimulate purchases of liquor.

Under this statute and in reliance upon the provisions of the act of Congress known as the Webb-Kenyon Law (Act of Congress of March 1, 1913, 37 Stat. 699), the State of West Virginia in one of its courts sued the Western Maryland Railway Company and the Adams Express Company to enjoin them from carrying from Maryland into West Virginia liquor in violation of law. In sub-

stance it was charged that very many shipments had been taken by the carriers contrary to the law both as to solicitations and as to the use for which the liquor was intended. Preliminary injunctions were issued restraining the carrying of liquor into the State subject to many conditions as to investigation, etc., etc. With these injunctions in force, these suits were commenced by the Clark Distilling Company to compel the carriers to take a shipment of liquor which it was asserted was ordered for personal use and deliver it in West Virginia, on the ground that the Act of Congress to Regulate Commerce imposed the duty to receive and carry and that besides the West Virginia prohibition law when rightly construed did not forbid it. The carriers, not challenging the asserted meaning of the West Virginia law, set up the injunctions and averred that to receive and carry the liquor would violate their provisions and therefore there was no duty under the United States law to do so. West Virginia intervened in the suits, relying upon the state law and the injunctions which had been issued. At the trial it was shown that the plaintiff Distilling Company had systematically solicited purchases and constantly shipped liquor from Maryland into West Virginia in violation of the prohibition law. The court held that the West Virginia law did not prohibit personal use, and did not forbid shipments for such use and that as there was no state prohibition, the Webb-Kenyon Law had no application, and that as the solicitations forbidden by the state statute were solicitations to do that which was forbidden, that consideration was irrelevant. The construction of the statute made by the state court was held not authoritatively binding, as that court was not one of last resort, and the right to practically modify the injunctions was declared to exist because West Virginia by making herself a party to the suits had submitted herself to the jurisdiction of the court. All questions concerning the power of the State of West Virginia

to pass the prohibition law if it meant otherwise, and of
the right of Congress to adopt the Webb-Kenyon Act
under a like hypothesis, were reserved. 219 Fed. Rep. 333.
Before the decrees entered became final the Circuit Court
of Appeals for the Fourth Circuit in a case pending before
it (*West Virginia* v. *Adams Express Company*, 219 Fed.
Rep. 794) decided directly to the contrary. It held that
the law of West Virginia did prohibit shipments for per-
sonal use; that it did forbid solicitations therefore for such
purchases; that by operation of the Webb-Kenyon Act
there was no longer a right to ship liquor into the State
in violation of its laws; and that both the state law and
the Webb-Kenyon Act were constitutional. Controlled
by such decision, the trial court recalled its opinion, heard
a re-argument, and, although not changing its view, ac-
cepted and gave effect to the conclusions reached by the
Circuit Court of Appeals because they were deemed to
be authoritative, and the cases were brought directly here,
because of the constitutional questions, to review such
action.

The issues to be decided may be embraced in four prop-
ositions which we proceed separately to consider.

1. *The correct meaning of the West Virginia law as to the
subjects in dispute.*

The difference as to the meaning of the statute in the
court below was whether or not the West Virginia law
prohibited the receipt of liquor for personal use; and if it
did, whether or not the prohibitions of the law equally
applied to shipments from outside and to those originating
in the State. But the possibility of dispute over these
subjects no longer exists because after the decision below
and since the cases were first argued (for they have been
here argued twice) the State of West Virginia amended the
statute so as to leave no room for doubt that it does forbid
all shipments, whether for personal use or otherwise, and
whether from within or without the State. The pertinent

provisions of the amendments are placed in the margin.[1]
As the relief sought is the permanent right to ship in the
future, the meaning of the statute now, that is, as amended,
is the test by which we must consider the questions re-
quiring solution.   Indeed, this is frankly admitted by the

---

[1] "SEC. 7. It shall be unlawful for any person to keep or have, for
personal use or otherwise, or to use, or permit another to have, keep
or use, intoxicating liquors at any restaurant, store, office building,
club, place where soft drinks are sold (except a drug store may have
and sell alcohol and wine as provided by sections four and twenty-
four), fruit stand, news stand, room, or place where bowling alleys,
billiard or pool tables are maintained, livery stable, boat house, public
building, park, road, street or alley.   It shall also be unlawful for any
person to give or furnish to another intoxicating liquors, except as
otherwise hereinafter provided in this section.   Any one violating this
section shall be guilty of a misdemeanor, and upon conviction thereof
shall be fined not less than one hundred dollars, nor more than five
hundred dollars, and be imprisoned in the county jail not less than
two nor more than six months; *provided, however,* that nothing con-
tained in this section shall prevent one, in his home, from having and
there giving to another intoxicating liquors when such having or giving
is in no way a shift, scheme or device to evade the provisions of this
act; but the word 'home' as used herein, shall not be construed to be
one's club, place of common resort, or room of a transient guest in a
hotel or boarding house.   And, *provided, further,* that no common car-
rier, for hire, nor other person, for hire or without hire, shall bring or
carry into this state, or carry from one place to another within the
state, intoxicating liquors for another, even when intended for personal
use; except a common carrier may, for hire, carry pure grain alcohol
and wine, and such preparations as may be sold by druggists for the
special purposes and in the manner as set forth in sections four and
twenty-four; and, *provided, further, however,* that in case of search and
seizure, the finding of any liquors shall be *prima facie* evidence that
the same are being kept and stored for unlawful purposes."

"SEC. 34. It shall be unlawful for any person in this state to receive,
directly or indirectly, intoxicating liquors from a common, or other
carrier.   It shall also be unlawful for any person in this state to possess
intoxicating liquors, received directly or indirectly from a common,
or other carrier in this state.   This section shall apply to such liquors
intended for personal use, as well as otherwise, and to interstate, as

parties since it is unequivocally declared that the question is the operation and effect of the statute as amended and its constitutionality. We therefore come to the second question, which is:

2. *The power of the State to enact the prohibition law consistently with the due process clause of the Fourteenth Amendment and the exclusive power of Congress to regulate commerce among the several States.*

That government can, consistently with the due process clause, forbid the manufacture and sale of liquor and regulate its traffic, is not open to controversy; and that there goes along with this power full police authority to make it effective, is also not open. Whether the general authority includes the right to forbid individual use, we need not consider, since clearly there would be power, as an incident to the right to forbid manufacture and sale, to restrict the means by which intoxicants for personal use could be obtained, even if such use was permitted. This being true, there can be no doubt that the West Virginia prohibition law did not offend against the due process clause of the Fourteenth Amendment.

But that it was a direct burden upon interstate commerce and conflicted with the power of Congress to regulate commerce among the several States, and therefore could not be used to prevent interstate shipments from Maryland into West Virginia, has been not open to question since the decision in *Leisy* v. *Hardin,* 135 U. S. 100. And this brings us to consider whether the Webb-Kenyon

_____

well as intrastate, shipments or carriage. Any person violating this section shall be guilty of a misdemeanor and upon conviction shall be fined not less than one hundred dollars nor more than two hundred dollars, and in addition thereto may be imprisoned not more than three months; *provided, however,* that druggists may receive and possess pure grain alcohol, wine and such preparations as may be sold by druggists for the special purpose and in the manner as set forth in sections four and twenty-four."

Law has so regulated interstate commerce as to give the State the power to do what it did in enacting the prohibition law and cause its provisions to be applicable to shipments of intoxicants in interstate commerce, thus saving that law from repugnancy to the Constitution of the United States, which is the third proposition for consideration.

3. *Assuming the constitutionality of the Webb-Kenyon Act, what is its true meaning and its operation upon the prohibitions contained in the West Virginia law?*

Omitting words irrelevant to the subject now under consideration, the title and text of the Webb-Kenyon Act are as follows:

"An Act Divesting intoxicating liquors of their interstate character in certain cases.

"   .  .  .   That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory, or District of the United States, . . . into any other State, Territory, or District of the United States, . . . which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or District of the United States, . . . is hereby prohibited."

As the state law forbade the shipment into or transportation of liquor in the State whether from inside or out, and all receipt and possession of liquor so transported without regard to the use to which the liquor was to be put, and as the Webb-Kenyon Act prohibited the transportation in interstate commerce of all liquor "intended . . . to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State," there would seem

to be no room for doubt that the prohibitions of the state law were made applicable by the Webb-Kenyon Law. If that law was valid, therefore, the state law was not repugnant to the commerce clause. It is insisted that this view gives too wide an effect to the Webb-Kenyon Law since that act was only intended to include state prohibitions in so far as they forbade the shipment, receipt and possession of liquor for a forbidden use, and hence as individual use was not forbidden by the state law, the shipment, receipt and possession for such use was not embraced by the Webb-Kenyon Act and the state law, so far as it was outside of that act, was repugnant to the commerce clause. This is sought to be supported by the historical environment of the Webb-Kenyon Act as evidenced by the debates on its passage and by a decision of this court, as well as decisions of state courts (which are in the margin[1]) which, it is insisted, have so construed that act.

Assuming, for the sake of argument only, that the debates may be resorted to for the purpose of showing environment, we are of opinion they clearly establish a result directly contrary to that which they are cited to maintain. Undoubtedly they show that it was insisted the act was not intended to interfere with personal use, as of course it was not, since its only purpose was to give effect to state prohibitions, not to compel the States to prohibit personal use. Indeed, the meaning which it is sought to affix to the Webb-Kenyon Act, if accepted, would cause that act to have the effect of compelling the States to prohibit personal use, since if all the prohibitions of state laws against manufacture, sale, receipt and possession of intoxicants remained subject to the danger of indirect

---

[1] *Van Winkle* v. *State*, 27 Del. 578; *Adams Express Co.* v. *Commonwealth*, 154 Ky. 462; *Adams Express Co.* v. *Commonwealth*, 160 Ky. 66; *Palmer* v. *Southern Express Co.*, 129 Tenn. 116; *Ex parte Peede*, 75 Tex. Crim. Rep. 247.

violation by permitting shipment, receipt and possession for personal use, it would follow that a necessary and immediate incentive was imposed upon the States by the Webb-Kenyon Act to enact a provision against personal use.

The antecedents of the Webb-Kenyon Act, that is, its legislative and judicial progenitors, leave no room for the contention made. To correct the great evil which was asserted to arise from the right to ship liquor into a State through the channels of interstate commerce and there receive and sell the same in the original package in violation of state prohibitions, was indisputably the purpose which led to the enactment of the Wilson Law (Act of Congress of August 8, 1890, 26 Stat. 313) forbidding the sale of liquor in a State in the original package even although brought in through interstate commerce when the existing or future state laws forbade sales of intoxicants. And this was recognized by the long line of decisions (a few of the leading cases are in the margin [1]) which upheld that law and pointed out that it permitted the state prohibitions to take away from interstate commerce shipments a right which they otherwise would have embraced, that is, the right to sell after receipt in the original package, any state law to the contrary nothwithstanding. At the same time it was recognized, however, that as the right to receive liquor was not affected by the Wilson Act, such receipt and the possession following from it and the resulting right to use remained protected by the commerce clause even in a State where what is known as the dispensary system prevailed. *Vance* v. *Vandercook Company,* 170 U. S. 438. Reading the Webb-Kenyon Law in the light thus thrown upon it by the Wilson Act and the decisions of this court which sustained and applied it,

[1] *In re Rahrer,* 140 U. S. 545; *Rhodes* v. *Iowa,* 170 U. S. 412; *American Express Co.* v. *Iowa,* 196 U. S. 133; *Pabst Brewing Co.* v. *Crenshaw,* 198 U. S. 17; *Rosenberger* v. *Pacific Express Co.,* 241 U. S. 48.

there is no room for doubt that it was enacted simply
to extend that which was done by the Wilson Act, that
is to say, its purpose was to prevent the immunity char-
acteristic of interstate commerce from being used to per-
mit the receipt of liquor through such commerce in States
contrary to their laws, and thus in effect afford a means
by subterfuge and indirection to set such laws at naught.
In this light it is clear that the Webb-Kenyon Act, if
effect is to be given to its text, but operated so as to cause
the prohibitions of the West Virginia law against ship-
ment, receipt and possession to be applicable and con-
trolling irrespective of whether the state law did or did
not prohibit the individual use of liquor. That such also
was the embodied spirit of the Webb-Kenyon Act plainly
appears since if that be not true, the coming into being of
the act is wholly inexplicable.

The case in this court relied upon to establish the con-
trary (*Adams Express Company* v. *Kentucky,* 238 U. S.
190) clearly does not do so. All that was decided in that
case was that as the court of last resort of Kentucky into
which liquor had been shipped had held that the state
statute did not forbid shipment and receipt of liquor for
personal use, therefore the Webb-Kenyon Act did not
apply, since it only applied to things which the state law
prohibited. The leading state case cited is *Van Winkle*
v. *State,* 27 Delaware, 578. It is true in that case the
state law prohibited shipment to and receipt of intoxicants
in local option territory, and if the Webb-Kenyon Law
had been applied, there would have been no possible
ground for claiming that the state prohibitions could be
escaped because the liquor was shipped in interstate com-
merce. But the shipment was held to be protected as
interstate commerce despite the state prohibition because
the Webb-Kenyon Law was not correctly applied, for
the following reason: Coming to consider the text of that
law, the court said that as the Webb-Kenyon Act pro-

hibited the shipment of intoxicants "only when the liquor is intended to be used in violation of the law of the state," and as the liquor shipped was intended for personal use, which was not forbidden, therefore the shipment, although prohibited by the state law, was beyond the reach of the Webb-Kenyon Act. But we see no ground for following the ruling thus made since, as we have already pointed out, it necessarily rested upon an entire misconception of the text of the Webb-Kenyon Act, because that act did not simply forbid the introduction of liquor into a State for a prohibited use, but took the protection of interstate commerce away from all receipt and possession of liquor prohibited by state law.

The movement of liquor in interstate commerce and the receipt and possession and right to sell prohibited by the state law having been in express terms divested by the Webb-Kenyon Act of their interstate commerce character, it follows that if that act was within the power of Congress to adopt, there is no possible reason for holding that to enforce the prohibitions of the state law would conflict with the commerce clause of the Constitution; and this brings us to the last question, which is:

4. *Did Congress have power to enact the Webb-Kenyon Law?*

We are not unmindful that opinions adverse to the power of Congress to enact the law were formed and expressed in other departments of the government. Opinion of the Attorney General, 30 Op. A. G. 88; Veto Message of the President, Cong. Rec., vol. 49, pt. 5, p. 4291. We are additionally conscious, therefore, of the responsibility of determining these issues and of their serious character.

It is not in the slightest degree disputed that if Congress had prohibited the shipment of all intoxicants in the channels of interstate commerce and therefore had prevented all movement between the several States, such action would have been lawful because within the power

to regulate which the Constitution conferred. *Lottery Case*, 188 U. S. 321; *Hoke* v. *United States*, 227 U. S. 308. The issue, therefore, is not one of an absence of authority to accomplish in substance a more extended result than that brought about by the Webb-Kenyon Law, but of a want of power to reach the result accomplished because of the method resorted to for that purpose. This is certain since the sole claim is that the act was not within the power given to Congress to regulate because it submitted liquors to the control of the States by subjecting interstate commerce in such liquors to present and future state prohibitions, and hence in the nature of things was wanting in uniformity. Let us test the contentions by reason and authority.

The power conferred is to regulate, and the very terms of the grant would seem to repel the contention that only prohibition of movement in interstate commerce was embraced. And the cogency of this is manifest since if the doctrine were applied to those manifold and important subjects of interstate commerce as to which Congress from the beginning has regulated, not prohibited, the existence of government under the Constitution would be no longer possible.

The argument as to delegation to the States rests upon a mere misconception. It is true the regulation which the Webb-Kenyon Act contains permits state prohibitions to apply to movements of liquor from one State into another, but the will which causes the prohibitions to be applicable is that of Congress, since the application of state prohibitions would cease the instant the act of Congress ceased to apply. In fact the contention previously made that the prohibitions of the state law were not applicable to the extent that they were broader than the Webb-Kenyon Act is in direct conflict with the proposition as to delegation now made.

So far as uniformity is concerned, there is no question

that the act uniformly applies to the conditions which call its provisions into play—that its provisions apply to all the States,—so that the question really is a complaint as to. the want of uniform existence of things to which the act applies and not to an absence of uniformity in the act itself.  But aside from this it is obvious that the argument seeks to engraft upon the Constitution a restriction not found in it, that is, that the power to .regulate conferred upon Congress obtains subject to the requirement that regulations enacted shall be uniform throughout the United States.  In view of the conceded power on the part of Congress to prohibit the movement of intoxicants in interstate commerce, we cannot admit that because it did not exert its authority to the full limit, but simply regulated to the extent of permitting the prohibitions in one State to prevent the use of interstate commerce to ship liquor from another State, Congress exceeded its authority to regulate.  We can see, therefore, no force in the argument relied upon tested from the point of view of reason, and we come to the question of authority.

It is settled, says the argument, that interstate commerce is divided into two great classes, one embracing subjects which do not exact uniformity and which, although subject to the regulation of Congress, are in the absence of such regulation subject to the control of the several States (*Cooley* v. *Board of Wardens*, 12 How. 299), and the other embracing subjects which do require uniformity and which in the absence of regulation by Congress remain free from all state control (*Leisy* v. *Hardin*, 135 U. S. 100).  As to the first, it is said, Congress may, when regulating, to the extent it deems wise to do so permit state legislation enacted or to be enacted to govern, because to do so would only be to do that which would exist if nothing had been done by Congress.  As to the second class, the argument is, that in adopting regulations Congress is wholly without power to provide for the ap-

plication of state power to any degree whatever, because in the absence of the exertion by Congress of power to regulate, the subject-matter would have been free from state control, and because, besides, the recognition of state power under such circumstances would be to bring about a want of uniformity. But granting the accuracy of the two classifications which the proposition states, the limitation upon the power of Congress to regulate which is deduced from the classifications finds no support in the authority relied upon to sustain it. Let us see if this is not the case by examining the authority relied upon. What is that authority? The ruling in *Leisy* v. *Hardin, supra.* But that case, instead of supporting the contention, plainly refutes it for the following reason: Although *Leisy* v. *Hardin* declared in express terms that the movement of intoxicants in interstate commerce belonged to that class which was free from all interference by state control in the absence of regulation by Congress, it was at the same time in the most explicit terms declared that the power of Congress to regulate interstate commerce in intoxicants embraced the right to subject such movement to state prohibitions and that the freedom of intoxicants to move in interstate commerce and the protection over it from state control arose only from the absence of congressional regulation and would endure only until Congress had otherwise provided. Thus in that case in pointing out that the movement of intoxicants in interstate commerce was under the control of Congress despite the wide scope of the police authority of the State over the subject, it was said (p. 108): "Yet a subject matter which has been confided exclusively to Congress by the Constitution is not within the jurisdiction of the police power of the State, unless placed there by congressional action." Again, referring to the uniform operation of interstate commerce regulations it was said (p. 109): "Hence, inasmuch as interstate commerce, consisting in the transportation, pur-

chase, sale and exchange of commodities, is national in its character, and must be governed by a uniform system, so long as Congress does not pass any law to regulate it, or allowing the States so to do, it thereby indicates its will that such commerce shall be free and untrammelled." Further the court said (p. 119): "The conclusion follows that, as the grant of the power to regulate commerce among the States, so far as one system is required, is exclusive, the States cannot exercise that power without the assent of Congress, . . ." Again after pointing out that the question of the prohibition of manufacture and sale of particular articles was a matter of state concern, it was said (pp. 123, 124): "But notwithstanding it is not vested with supervisory power over matters of local administration, the responsibility is upon Congress, so far as the regulation of interstate commerce is concerned, to remove the restriction upon the State in dealing with imported articles of trade within its limits, which have not been mingled with the common mass of property therein, if in its judgment the end to be secured justifies and requires such action." And finally, after pointing out that the States had no power to interfere with the movement of goods in interstate commerce before they had been commingled with the property of the State, it was said that this limitation obtained "in the absence of congressional permission" to the State (p. 124).

Thus it follows that although we accept the classification of interstate commerce in intoxicants made in *Leisy* v. *Hardin,* we could not accept the contention which is now based upon that classification without in effect overruling that case, or what is equivalent thereto, refusing to give effect to the doctrine of that case announced in terms so certain that there is no room for controversy or contention concerning them. But we would be required to go further than this, since it would result that we would have to shut our eyes to the construction put upon the

ruling in *Leisy* v. *Hardin* by Congress in legislating when it adopted the Wilson Act and also to practically overrule the line of decisions which we have already referred to sustaining and enforcing that act. Let us see if this is not certain. As we have already pointed out, the very regulation made by Congress in enacting the Wilson Law to minimize the evil resulting from violating prohibitions of state law by sending liquor through interstate commerce into a State and selling it in violation of such law was to divest such shipments of their interstate commerce character and to strip them of the right to be sold in the original package free from state authority which otherwise would have obtained. And that Congress had the right to enact this legislation making existing and future state prohibitions applicable, was the express result of the decided cases to which we have referred, beginning with *In re Rahrer*, *supra*. As the power to regulate which was manifested in the Wilson Act and that which was exerted in enacting the Webb-Kenyon Law are essentially identical, the one being but a larger degree of exertion of the identical power which was brought into play in the other, we are unable to understand upon what principle we could hold that the one was not a regulation without holding that the other had the same infirmity, a result which, as we have previously said, would reverse *Leisy* v. *Hardin* and overthrow the many adjudications of this court sustaining the Wilson Act.

These considerations dispose of the contention, but we do not stop with stating them but recur again to the reason of things for the purpose of pointing out the fundamental error upon which the contention rests. It is this: The mistaken assumption that the accidental considerations which cause a subject on the one hand to come under state control in the absence of congressional regulation, and other subjects on the contrary to be free from state control until Congress has acted, are the essential criteria by which to test the question of the power of Congress to

regulate and the mode in which the exertion of that power may be manifested. The two things are widely different, since the right to regulate and its scope and the mode of exertion must depend upon the power possessed by Congress over the subject regulated. Following the unerring path pointed out by that great principle we can see no reason for saying that although Congress in view of the nature and character of intoxicants had a power to forbid their movement in interstate commerce, it had not the authority to so deal with the subject as to establish a regulation (which is what was done by the Webb-Kenyon Law) making it impossible for one State to violate the prohibitions of the laws of another through the channels of interstate commerce. Indeed, we can see no escape from the conclusion that if we accepted the proposition urged, we would be obliged to announce the contradiction in terms that because Congress had exerted a regulation lesser in power than it was authorized to exert, therefore its action was void for excess of power. Or, in other words, stating the necessary result of the argument from a concrete consideration of the particular subject here involved, that because Congress in adopting a regulation had considered the nature and character of our dual system of government, State and Nation, and instead of absolutely prohibiting, had so conformed its regulation as to produce coöperation between the local and national forces of government to the end of preserving the rights of all, it had thereby transcended the complete and perfect power of regulation conferred by the Constitution. And it is well again to point out that this abnormal result to which the argument leads concerns a subject as to which both State and Nation in their respective spheres of authority possessed the supremest authority before the action of Congress which is complained of, and hence the argument virtually comes to the assertion that in some undisclosed way by the exertion of congressional authority, power possessed has evaporated.

It is only necessary to point out that the considerations which we have stated dispose of all contentions that the Webb-Kenyon Act is repugnant to the due process clause of the Fifth Amendment, since what we have said concerning that clause in the Fourteenth Amendment as applied to state power is decisive.

Before concluding we come to consider what we deem to be arguments of inconvenience which are relied upon, that is, the dread expressed that the power by regulation to allow state prohibitions to attach to the movement of intoxicants lays the basis for subjecting interstate commerce in all articles to state control and therefore destroys the Constitution. The want of force in the suggested inconvenience becomes patent by considering the principle which after all dominates and controls the question here presented, that is, the subject regulated and the extreme power to which that subject may be subjected. The fact that regulations of liquor have been upheld in numberless instances which would have been repugnant to the great guarantees of the Constitution but for the enlarged right possessed by government to regulate liquor, has never that we are aware of been taken as affording the basis for the thought that government might exert an enlarged power as to subjects to which under the constitutional guarantees such enlarged power could not be applied. In other words, the exceptional nature of the subject here regulated is the basis upon which the exceptional power exerted must rest and affords no ground for any fear that such power may be constitutionally extended to things which it may not, consistently with the guarantees of the Constitution, embrace.

*Affirmed.*

MR. JUSTICE McREYNOLDS concurs in the result.

MR. JUSTICE HOLMES and MR. JUSTICE VAN DEVANTER dissent.